Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| FORREST HILL COMMUNITY ASSOCIATION, INC.; GAYTHA KRAUSER; KIMBERLY REEVE; and JOHN HINTZE, <br><br> **Plaintiffs,** <br><br> v. <br><br> PUBLIC SERVICES ELECTRIC & GAS COMPANY; CITY OF NEWARK; PHILLIP SCOTT; and CHRISTOPHER WATSON, <br><br> **Defendants.** | Civil Action No.: 19-16692 (ES) (MAH) <br><br> OPINION |

**SALAS, DISTRICT JUDGE**

Plaintiffs Forrest Hill Community Association, Inc. ("FHCA"), Gaytha Krauser, Kimberly Reeve, and John Hintze assert both federal and state causes of action against Defendant Public Services Electric & Gas Company ("PSE&G") and Defendants City of Newark and City of Newark officials Phillip Scott and Christopher Watson ("Newark Defendants"). (D.E. No. 53, Amended Complaint ("Am. Compl.")). PSE&G and Newark Defendants move to dismiss the Amended Complaint for lack of subject matter jurisdiction and for failure to state a claim. (D.E. Nos. 65 & 66). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). As set forth below, the motions are GRANTED.

## I.   BACKGROUND

Plaintiffs allege that PSE&G and Newark Defendants violated federal and state law by constructing two transmission lines in the Forest Hill Historic District (the "District"). Before discussing the alleged facts supporting their claims, the Court details the regulatory background

on building transmission lines in the District.

### A.   Regulatory Background

Located in Newark, New Jersey, the District is listed as a historic place on the National Register of Historic Places, as established under the National Historic Preservation Act, 54 U.S.C. § 300101 *et seq.*   (Am. Compl. ¶ 50).   As a result, the City of Newark's zoning and land use regulations for historic places automatically designates the District as a historic place and, consequently, imposes various use restrictions on property and land within the District.   *See* Newark, N.J., Code § 41:10-4-3.   Indeed, the general rule is that "[i]n no case . . . shall any use be permitted which requires demolition, relocation, or alteration of a designated historic building, structure, site or within a designated district so as to adversely affect its character *except* upon compliance with the terms of this Chapter."   *Id.* § 41:10-5-3 (emphasis added).   Relevant in this case are several regulations governing the exception to the general rule.

*First*, to engage in specified "actions" within the Historic District, a person must obtain a permit from an "Administrative Officer."   *Id.* § 41:10-7-2.   Such actions include "[r]ehabilitation, restoration, reconstruction, repair or alteration or change to any part of the exterior of a building, *structure* or site, including repainting and residing, if visible from a public street," *id.* § 41:10-7-2(1) (emphasis added); "[a]dditions to a building, *structure* or site, or within a district if visible from a public street," *id.* § 41:10-7-2(2) (emphasis added); and "[n]ew construction on a historic site or within a district," *id.* § 41:10-7-2(5).   The term "structure" appears to include the relevant transmission lines because the regulations define the word "structure" to include "poles."   *Id.* § 41:10-2.

*Second*, the Administrative Officer may not issue a permit, and the above actions may not begin, until the Newark Landmarks and Historic Preservation Commission ("Commission")

reviews and approves, in a written report, an application for a permit.  *Id.* §§ 41:10-7-1 & 41:10-7-3.  A person seeking to undertake an action that requires review "must submit a completed application to the Commission," *id.* § 41:10-11-1, and a completed application must contain specific content in a particular format, *id.* § 41:10-11-2(1)–(6).  The Commission's approval is "known as a Certificate of Appropriateness."  *Id.* § 41:10-13-4.

*Third*, the regulations outline the standards that guide the Commission's decision making for all applications.  *Id.* § 41:10-14-1.  That section then goes on to list eight standards, some of which are, for example:

> 1. New additions, exterior alterations, or related new construction shall not destroy historic materials that characterize the property. The new work shall be differentiated from the old and shall be compatible with the massing, size, scale and architectural features to protect the historic integrity of the property and its environment.
>
> . . . .
>
> 4. New additions, alterations or new construction in a historic landscape shall be visually differentiated from the old and shall be compatible with the historic character of the landscape.
>
> . . . .
>
> 7. The historic character of a property shall be retained and preserved. The removal of historic materials, vegetation, or alteration of features and spaces that characterize a property shall be avoided.

*Id.* §§ 41:10-14-1(1), (4) & (7).

*Fourth*, applicants have a right to a hearing before the Commission upon request.  *Id.* § 41:10-13-1.  However, the applicant is not "required to appear or to be represented at the meeting in which the application is being considered."  *Id.*  The regulations do not state that a third-party may demand a hearing.  *See id.*  Nor do they contemplate that a hearing is *necessary* for every application.  *See id.*  However, it appears that the Commission holds "regularly scheduled

meetings." *Id.* § 41:10-13-2.  Indeed, "[c]ompleted applications for approval of a permit shall be submitted," the regulations say, "to the Administrative Officer a minimum of 14 days prior to a Commission's *regularly scheduled meeting*."  *Id.* (emphasis added).  Those meetings, it appears, are public.

*Fifth*, both applicants *and* interested persons may appeal the Commission's decision to the Board of Adjustment and, if necessary, subsequently seek relief in New Jersey Superior Court. The regulations are clear on an applicant's right to do so.  *Id.* §§ 41:10-21-3; 41:10-21-5.  Though the regulations say nothing of an interested person's right to do so, New Jersey law bridges that gap.  Pursuant to N.J.S.A. § 40:55D-72(a), "[a]ppeals to the [B]oard of [A]djustment may be taken by any interested party affected by any decision of an administrative officer of the municipality based on or made in the enforcement of the zoning ordinance or official map."  An interested party includes, the New Jersey Supreme Court has said, a neighbor whose "use and enjoy[ment of] her property" is impacted by a building permit.  *See Harz v. Borough of Spring Lake*, 191 A.3d 547, 557 (N.J. 2018).  This right to appeal is substantive.  *Id.*  An interested party may also file "a prerogative-writs action and Order to Show Cause in Superior Court aimed at enjoining the permit."  *Id.*; *see also* N.J.S.A. § 40:55D-18 (granting an "interested party" a right to "institute any appropriate action or proceedings to prevent" unlawful use of property).

*Sixth*, there are certain actions that do not require permits.  Those actions include changes to the interior of a structure, *see* Newark, N.J., Code § 41:10-8-1, or changes that are not visible to the public from a public street, *see id.* § 41:10-8-2.  Moreover, an applicant may bypass Commission review by obtaining a "Certification of No Effect" from the "Historic Preservation Officer."  *Id.* § 41-10-13-3.  The Historic Preservation Officer is the same person as the Administrative Officer.  *Id.* § 41:10-2.  The regulations define the "Certificate of No Effect" as "a

document attesting that proposed work within a historic district or affecting a landmark building, structure, object, site or landscape feature has been reviewed by the Historic Preservation Officer and has been deemed not detrimental to the historic district or landmark on which the work is to be done or neighboring buildings, structures, objects, sites or landscape features." *Id.* The Administrative Officer may issue, "at his or her discretion," such a certificate for an "[a]pplication[] for minor alterations and ordinary maintenance and repair." *Id.* § 41:10-13-3. Before issuing the certificate, the Administrative Officer "shall consider factors" such as "the effect of the proposed work" on "the architectural features of the landmark building, structure, object, site or landscape feature upon which such work is to be done and the relationship between the results of such work and the architectural features of neighboring buildings, structures, objects, sites and landscape features." *Id.* "In appraising such effects and relationships, factors of aesthetic, historical and architectural values and significance, architectural style, design, arrangement, texture, material and color in addition to any other pertinent matters shall be considered." *Id.*

### B. Factual Background

FHCA is a non-profit organization whose members consist of District residents. (Am. Compl. ¶ 37). FHCA represents its members' interests by organizing and advocating for "preserving the architectural, historical, cultural, environmental and aesthetic qualities of the . . . District." (*Id.*). Plaintiffs Krauser, Hintze, and Reeve are FHCA members and District residents. (*Id.* ¶¶ 38–40). They, too, are active in such organizing and advocacy. (*Id.*).

On August 15, 2019, PSE&G began constructing two high voltage transmission lines on public rights of way in the District. (*Id.* ¶¶ 49 & 151). In particular, PSE&G began the construction of 65-foot-tall transmission polls along 1st Street/Old Road to Bloomfield and Elwood Street, between Heller Parkway and Summer Avenue. (*Id.* ¶ 3). PSE&G and Newark Defendants claimed

that the project was merely to replace older poles, which Plaintiffs dispute.  (*Id.* ¶¶ 8 & 196 n.6).

Plaintiffs objected to the project and continue to do so.  (*Id.* ¶¶ 47–48).  Plaintiffs believe the transmission lines will decrease their property values by negatively impacting the District's architectural, archeological, engineering, cultural, and aesthetic appeal; by removing "Historic Trees"; and by reducing "their enjoyment and use of the . . . District."  (*Id.* ¶ 31).  They also believe the transmission lines are dangerous.  (*Id.* ¶¶ 14 & 39).  For example, according to the Amended Complaint, the transmission lines were built in front of Hintze's property in the precise location where a car had crashed a year earlier.  (*Id.* ¶ 39).  Had the transmission lines been there at the time of the accident, Plaintiffs allege, Hintze, his family, and his home would have been "incinerated."  (*Id.*).  Plaintiffs further allege that the transmission lines cause "adverse physical and mental health effects" because their construction brought electromagnetic fields and wood preservatives, both of which are carcinogenic and teratogenic, into the District.  (*Id.* ¶ 31).

Plaintiffs assert federal and state causes of action against PSE&G and Newark Defendants. Most significantly, Plaintiffs claim that PSE&G and Newark Defendants conspired to violate their constitutional rights by building the transmission lines in knowing violation of the City of Newark's zoning and land use regulations for historic places.  (*Id.* ¶¶ 1–10 & 50).  On this issue, Plaintiffs appear to allege the following:

*First*, Plaintiffs allege that PSE&G obtained a "building permit" on April 3, 2019, without first submitting an application to the Commission.  (*Id.* ¶ 24; *see also id.* ¶¶ 174–83).  The permit is entitled:

**CITY OF NEWARK**
**DEPARTMENT OF ENGINEERING**
**DIVISION OF TRAFFIC AND SIGNALS**
**PERMIT**
**STREET-SIDEWALK OPENING**

(D.E. No. 53-1, Ex. A, at 8 (ECF pagination)).[1]  The permit authorized PSE&G to occupy the street-sidewalk in front of various locations, including Passaic Street, 3rd Avenue, Summer Avenue, and Heller Parkway.  (*Id.*).  The purpose of the permit was to facilitate the replacement of the transmission poles.  (*Id.*).  However, even though Plaintiffs refer to it as a "building permit," the permit did not, it appears, purport to independently authorize PSE&G to build the transmission lines in the covered areas.  (*Id.*).  Instead, it allows PSE&G to occupy the area.

*Second*, Plaintiffs allege that PSE&G and Newark Defendants later "fraudulently doctored" the above permit to replace Heller Parkway with Elwood Street—the street along which many of the transmission pools were erected.  (Am. Compl. ¶ 98; *see also id.* ¶¶ 92–97).  Plaintiffs attached the allegedly altered permit to the Amended Complaint, and it bears the same permit number as the original but does not reflect the date of the alteration or who altered it.  (D.E. No. 53-1, Ex. B, at 20 (ECF pagination)).

*Third*, separate from the street-sidewalk permit, Plaintiffs allege that PSE&G did not obtain a proper building permit prior to construction as required under the regulations.  (Am. Compl. ¶¶ 56–61, 63–68 & 75).  Instead, PSE&G obtained "administrative approval" for the project.  (*See id.* ¶ 134).  Indeed, on May 16, 2019, PSE&G submitted an application to conduct work in the District, and the application was stamped "**APPROVED**" by the Commission on the same day.  (D.E. No. 53-1, Ex. B, at 22 (ECF pagination)).  On August 15, 2019, PSE&G submitted another application for work in the Historic District—this time altering certain language and changing the covered locations.  (*Id.* at 25).  That application was stamped "**APPROVED**" by the Commission on August 19, 2019.  (*Id.*).

---

[1]      Because Plaintiffs attached the permit to the Amended Complaint, and because it is integral to their claims, the Court may consider it here, along with the other permits attached to the Amended Complaint.  *Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020) (considering exhibit attached to the complaint and integral to the plaintiff's complaint on a motion to dismiss).

According to Plaintiffs, there are several issues with these administrative approvals. For starters, there is "no such thing," according to Plaintiffs, "as an administrative approval of work to be done in the . . . District" under the regulations. (Am. Compl. ¶ 135). Instead, the regulations required PSE&G to obtain either a Certificate of No Effect from the Administrative Officer or a Certificate of Appropriateness from the Commission. (*Id.* ¶ 138). The "administrative approval" is neither of the two, Plaintiffs say, because the person who signed the approval—Christopher Watson, the City of Newark's Planning Officer—left unmarked the boxes that would have designated the approval as such. (*Id.* ¶ 136). Moreover, Plaintiffs allege that a Certificate of Appropriateness would not have been appropriate because PSE&G did not obtain Commission review or otherwise submit a proper application. (*Id.* ¶¶ 146–48 & 167). Nor would a Certificate of No Effect have been appropriate because the construction was not for minor alterations or ordinary maintenance and repair. (*Id.* ¶¶ 156–64). In addition, PSE&G received the "administrative approval" on August 19—four days *after* it began construction. (*Id.* ¶¶ 134 & 152–53). Finally, Watson did not have the authority to sign off on the approval because he is not a member of the Commission—only Phillip Scott, the Director of the Department of Engineering for the City of Newark, "was responsible for issuing the necessary building permits." (*Id.* ¶ 42).

*Fourth*, Plaintiffs allege that PSE&G deceived them about the project's dates. According to Plaintiffs, on August 8, 2019, PSE&G and Watson met with Plaintiffs concerning the project. (*Id.* ¶ 48). PSE&G advised Plaintiffs that it would not begin cutting down trees until August 19, 2019, or erecting poles until the last week of August. (*Id.*). However, PSE&G began the project on August 15, 2019. (*Id.* ¶ 49).

Plaintiffs claim that, by skirting proper procedure and misleading them, PSE&G deprived them of two procedural rights guaranteed under the land-use regulations for historic places. First

is the right to voice their concerns and argue that the project did not meet substantive regulatory standards—to the Commission at a public hearing.  (*Id.* ¶¶ 70–74).  According to Plaintiffs, public opinion is "the best evidence of exactly what constitutes the distinctive character of the . . . District . . . and what would do injury to th[at] distinctive character."  (*Id.* ¶ 70).  Second is the right to appeal the Commission's decision to the Board of Adjustment and, if the Board of Adjustment affirms, to challenge the decision in New Jersey Superior Court.  (*Id.* ¶¶ 82–83).

Plaintiffs claim that Newark Defendants facilitated the construction project by providing "administrative approval" for the project (*id.* ¶¶ 171, 173, 195 & 206); "assigning multiple police officers and squad cars to secure the site as PSE&G constructed the unlawful high voltage transmission line" (*id.* ¶¶ 111, 131 & 220); and failing to enforce the City of Newark's zoning and land use regulations for historic places against PSE&G (*id.* ¶¶ 80–81).  On this last point, Plaintiffs allege that an Administrative Officer was required to—but did not—enforce the regulations against PSE&G by "serv[ing] a notice upon the applicant[] that he is in violation of the [regulations] and has fourteen business days to abate the violation."  (*Id.*; *see also id.* ¶ 109A).  "[T]hen, if the applicant does not abate the violation, the Administrative Officer must cause a summons and complaint to issue against the applicant, seeking fines for each day that the violation continues."  (*Id.* ¶ 80) (alteration in original).

## C.    Procedural History

Plaintiffs filed suit the day construction began.  (D.E. No. 1).  Their original complaint asserted two federal claims—*first*, that the City of Newark denied them due process of law "by refusing to enforce" the regulations for historic places, and *second*, that the City of Newark and PSE&G conspired to violate their due process rights.  (*Id.* ¶¶ 30 & 31).  They twice moved for emergent relief, which the Court twice denied.  The first time, relief was denied for failure to

follow Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1.  (D.E. No. 3).  The second time, relief was denied for failure to sufficiently support their standing to sue and their claim of irreparable harm in the absence of emergent relief.  (D.E. No. 16).

Defendants then moved to dismiss Plaintiffs' complaint.  (D.E. No. 25).  In response, Plaintiffs indicated their intent to file an amended complaint.  (D.E. No. 34).  Consequently, the Court administratively terminated the motion to dismiss and allowed Plaintiffs to amend.  (D.E. No. 47).

Plaintiffs amended their complaint on July 29, 2020.  Plaintiffs claim that PSE&G and Newark Defendants conspired to deprive them of procedural due process and to effect unconstitutional takings.  (Am. Compl.  ¶¶ 84–85 & 222).  Plaintiffs base their procedural due process claim on the City of Newark's failure to enforce its regulations against PSE&G.  (*Id.* ¶ 84).  And they base their unconstitutional takings claim on the allegation that constructing the transmission poles deprived them of their "legal interests in the Forest Hill Historic District."  (*Id.* ¶¶ 2, 30, 35 & 222).  Plaintiffs also assert various other state law claims.

PSE&G and Newark Defendants move to dismiss the Amended Complaint, contesting standing to sue and whether Plaintiffs sufficiently pleaded their causes of action.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(1), a court may dismiss a claim at the pleading stage if the court does not have jurisdiction.  "A motion to dismiss for want of standing is also properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter."  *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007).  "Two types of challenges can be made under Rule 12(b)(1)—'either a facial or a factual attack.'"  *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 632 (3d Cir. 2017) (quoting *Davis v. Wells Fargo*, 824 F.3d 333, 346

(3d Cir. 2016)).  In assessing a facial challenge, the Court accepts the factual allegations as true.  *See In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).  PSE&G and Newark Defendants raise a facial challenge, so the Court accepts the Plaintiffs' factual allegations as true.

In assessing whether a complaint states a cause of action sufficient to survive dismissal under Federal Rule of Civil Procedure 12(b)(6), the Court accepts "all well-pleaded allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018).  "[T]hreadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements" are all disregarded.  *Id.* at 878–79 (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)).  The complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and a claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (first quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010); and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Although generally confined to the allegations in the complaint, the Court may, without converting the motion to dismiss to one for summary judgment, consider a document "*integral to or explicitly relied* upon in the complaint," as well as "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (first quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996); and then quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n.9 (3d Cir. 1993)); *see also Lum v. Bank of*

*Am.*, 361 F.3d 217, 221 n.3 (3d Cir. 2004) ("In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.").

## III.   DISCUSSION

### A.   Standing

Standing is derived from the Article III's "case or controversy" requirement.  *Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997). Constitutional standing consists of three elements: injury, causation, and redressability.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  More specifically, the plaintiff must allege that he or she (i) suffered an injury in fact, (ii) that is fairly traceable to the challenged conduct of the defendant, and (iii) that is likely to be redressed by a favorable judicial decision.  *Id.*

PSE&G and Newark Defendants contest the injury-in-fact element.  (D.E. No. 65-1 ("PSE&G Mov. Br.") at 8–10; D.E. No. 66-7 ("Newark Defs. Mov. Br.") at 11–12).  That element is the "'foremost' of standing's three elements."  *Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 886 (3d Cir. 2020) (quoting *Spokeo*, 578 U.S. at 338).  It requires "the party invoking federal jurisdiction" to "establish three sub-elements: first, the invasion of a legally protected interest; second, that the injury is both 'concrete and particularized'; and third, that the injury is 'actual or imminent, not conjectural or hypothetical.'"  *Id.* (quoting *Spokeo*, 578 U.S. at 339).  In particular, PSE&G argues that Plaintiffs do not allege a particularized injury but rather a general grievance because the injuries Plaintiffs allege—that the transmission poles "are dangerous, will decrease property value, will create electromagnetic fields[,] and will degrade the architectural and aesthetic qualities of the historical district"—are "'plainly undifferentiated and common to all

members of the public.'"  (PSE&G Mov. Br. at 9 (quoting *United States v. Richardson*, 418 U.S. 166, 176–77 (1974))).  Moreover, Plaintiffs' allegations concerning future injury—the prospect of physical injury from the increased danger posed by the transmission poles—are "highly speculative."  (*Id.*).  Newark Defendants separately argue the same.  (Newark Defs. Mov. Br. at 10–11).

Plaintiffs sufficiently allege a particularized injury.  They allege, and the Court accepts as true, that the transmission poles will diminish their property values and negatively impact the aesthetic appeal of their neighborhood.  Those two injuries, the Third Circuit has held, are particularized.  For example, in *Taliaferro v. Darby Township Zoning Board*, 458 F.3d 181 (3d Cir. 2006), the Third Circuit held that nearby property owners had standing because they alleged "that the construction of [a] storage facility w[ould] lower their property values, reduce the aesthetics in their community[,] and create excess noise and traffic, including heavy truck traffic on their residential streets."  *Id.* at 190.  And in *Society Hill Towers Owners' Association v. Rendell*, 210 F.3d 168 (3d Cir. 2000), the Third Circuit held residents had standing because they alleged that a nearby construction project "w[ould] have a detrimental effect on the ambiance of their historic neighborhood, that it w[ould] impair their use and enjoyment of [their neighborhood], and that it w[ould] decrease their property values."  *Id.* at 176.  Just as the plaintiffs did in *Taliaferro* and *Society Hill Towers Owners' Association*, Plaintiffs here allege a particularized injury.

Contrary to PSE&G's suggestion, the fact that many other members of Plaintiffs' community suffer the same or similar injuries does not mean they allege a general grievance.  "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the

judicial process." *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972).  Plaintiffs therefore allege particularized injuries, not general grievances, and they have standing to sue.

**B.      State Action**

PSE&G moves to dismiss the federal constitutional claims on the basis that it is not a state actor.  (PSE&G Mov. Br. at 4–8).  Plaintiffs agree that PSE&G is generally not a state actor— because it is a private company—but argue PSE&G became a state actor by conspiring with Newark Defendants to deprive Plaintiffs of their due process rights.  (D.E. No. 69 ("Opp. Br. to PSE&G") at 28–32).

An otherwise private actor may become a state actor in limited circumstances, including

> (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity.

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (internal citation omitted). The third circumstance is called the joint action test, and that test may be satisfied when a private party conspires with a state official to deprive a person of a constitutionally protected right.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970).  Indeed, a "private party 'who corruptly conspire[s]' with a state official will be considered a state actor under § 1983."  *Kitko v. Young*, 575 F. App'x 21, 26 (3d Cir. 2014) (quoting *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 175–76 (3d Cir. 2010)).  But a conspiracy requires an agreement, and to allege an agreement, the plaintiff must allege "facts that plausibly suggest a meeting of the minds."  *Great W. Mining & Min.*, 615 F.3d at 179 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also Kost v. Kozakiewicz*, 1 F.3d 176, 185 (3d Cir. 1993); *Startzell v. City of Phila.*, 533 F.3d 183, 205 (3d Cir. 2008).  "To plead conspiracy adequately, a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of

the alleged conspirators taken to achieve that purpose." *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 179 (3d Cir. 2010) (quoting *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1166 (3d Cir. 1989)); *see also Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 295 (3d Cir. 2018).  The complaint should, at a minimum, allege something that the private actor did or said to the state actor that suggests "an understanding" of an agreement.  *Obuskovic v. Wood*, No. 15-7520, 2016 WL 6471023, at *7 (D.N.J. Oct. 31, 2016) (quoting *Great W. Mining & Min.*, 615 F.3d at 178–79).  Indeed, a complaint must do more than allege unilateral action, *see Obuskovic v. Wood*, No. 15-7520, 2016 WL 6471023, at *7 (D.N.J. Oct. 31, 2016), or "parallel conduct or interdependence," *Twombly*, 550 U.S. at 554.

Plaintiffs' claim of conspiracy centers around the timing and content of various applications, permits, and approvals concerning the building project, as compared to what is required by the City of Newark's zoning and land use regulations for historic places.  (Opp. Br. to PSE&G at 28–32).  However, the Amended Complaint fails to sufficiently plead a conspiracy to violate constitutional rights.

*First*, Plaintiffs point to the street-sidewalk permit dated April 3, 2019, and the later-altered version of that permit.  (*Id.* at 30–31).  They claim that the street-sidewalk permit is really a "building permit" that was approved "without an application being made to the Commission." (Am. Compl. ¶ 24).  They claim that this fact suggests a conspiracy to violate constitutional rights because PSE&G and Newark Defendants knew the "building permit" was invalid.  (Opp. Br. to PSE&G at 30–31).  And "what nails the coffin shut," Plaintiffs allege, is that PSE&G and Newark Defendants later "doctored" the permit to replace Heller Parkway with Elwood Street—the street along which many of the new transmission pools were erected.  (*Id.* at 31).

However, these "street-sidewalk permits"—the original and altered version—are not

building permits.  While Plaintiffs claim they are, and while a district court must generally accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff, "the Court need not accept as true allegations that contradict matters properly subject to judicial notice or exhibit."  *Garcia v. New Jersey State Prison*, No. 05-3159, 2007 WL 2669332, at *1 (D.N.J. Sept. 6, 2007).  As noted above, the permits were issued by the "City of Newark Department of Engineering Division of Traffic and Signals," not by the Commission or any person specified in the regulations for historic places.  (D.E. No. 53-1, Ex. B, at 20 (ECF pagination)).  The permits gave PSE&G permission to occupy the street-sidewalk of various locations.  (*Id.*) While the purpose of the permits was to facilitate PSE&G replacing the transmission poles, the permits did not purport to be "building permits" or to independently authorize the project.  (*Id.*). Nothing in the City of Newark's zoning and land use regulations for historic places touches on the appropriateness of street-sidewalk permits—and Plaintiffs have pointed to nothing to suggest they have the right to contest a street-sidewalk permit.  Accordingly, Plaintiffs' claim of wrongdoing is hollow.

*Second*, Plaintiffs point to two applications for work in the Historic District that were stamped approved by the Commission.  (Opp. Br. to PSE&G at 29–31).  PSE&G submitted the first application on May 16, 2019, and the Commission approved the application the same day. (D.E. No. 53-1, Ex. B, at 22 (ECF pagination)).  The application described the proposed work as "[r]eplac[ing] 28 existing wood poles in their existing locations along Heller Parkway from First Street to Summer Avenue.  All poles will be 15 feet to accommodate the new line."  (*Id.* at 23). PSE&G submitted the second application on August 15, 2019, and the Commission approved the application on August 19, 2019.  (*Id.* at 25).  The application described the proposed work as "[r]eplac[ing] 28 existing wood poles in their existing locations along 1st St & Elwood Ave btwn

Heller Pkway & Summer Avenue.  All poles will be [approximately] 15 feet taller to accommodate the new line." (*Id.* at 26).

Plaintiffs argue that the first application plausibly suggests a conspiracy because it falsely stated that the poles would only be 15 feet tall even though the polls were 65 feet tall.  (Opp. Br. to PSE&G at 29–30).  And Plaintiffs further claim that the second application suggests a conspiracy because it did not satisfy regulatory requirements—specifically, because the application (i) was approved after the project began on August 15 even though building in the Historic District cannot commence until after approval; (ii) was administratively approved even though there is no mechanism for administrative approval in the regulations; (iii) was not approved by the appropriate official; and (iv) did not receive, nor could it receive, a Certificate of No Effect from the Administrative Officer or a Certificate of Appropriateness from the Commission.  (*Id.* at 15–20).  Plaintiffs claim that these procedural infirmities suggest a conspiracy to violate constitutional rights because Newark Defendants and PSE&G were aware of them and pushed forward, despite Plaintiffs' strong opposition, to deprive Plaintiffs of their right to be heard at a public hearing and to later appeal the decision of the Commission.  (*Id.* at 19).

However, Plaintiffs allege no more than parallel conduct or interdependence and fail to allege facts suggesting an agreement between PSE&G and Newark Defendants.  For the first application, they point to what could be described, at best, as a typographical error.  Indeed, while the first application said the polls would be 15 feet tall, the second application indicated that the polls would be 15 feet *taller*.  Moreover, the procedural infirmities outlined with respect to the second application do not suggest that PSE&G and Newark Defendants agreed to violate Plaintiffs' due process rights.  At most, it appears that both parties misunderstood or ignored certain local procedural requirements for building in the Historic District.  The Amended Complaint does not

plausibly suggest bad faith.  Finally, the Amended Complaint does not clearly allege the object of the conspiracy or that the object could plausibly have been achieved based on the actions of Newark Defendants and PSE&G.  Plaintiffs appear to complain that, had Newark Defendants and PSE&G followed the proper procedures, they would have been able to exercise their right to be heard in front of the Commission, in a later appeal to the Board of Adjustment, and in a later action for injunctive relief before the Superior Court.  However, the Municipal Code appears not to have granted them a right to be heard before the Commission, instead granting that right only to the applicant.  Newark, N.J., Code § 41:10-13-1.  And as explained below, it seems that Plaintiffs— regardless of the procedural infirmities outlined above—were never deprived of their state law right to appeal to the Board of Adjustment or to file a prerogative-writs action in Superior Court. *See* N.J.S.A. § 40:55D-18 (prerogative-writs action); *id.* § 40:55D-72(a) (appeal to Board of Adjustment); *Harz*, 191 A.3d at 557.

Accordingly, Plaintiffs fail to allege that PSE&G became a state actor by conspiring with Newark Defendants to violate their constitutional rights.  Thus, all federal constitutional claims brought against PSE&G are dismissed.[2]

### C.    Procedural Due Process

Plaintiffs claim they were denied procedural due process when Newark Defendants facilitated the construction project and did not enforce the City of Newark's zoning and land use regulations for historic places against PSE&G.  However, they do not adequately allege, as they must, that they were deprived of a constitutionally protected liberty or property interest.  *See Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006).  Accordingly, no process was due to them.

---

[2]      Even if Plaintiffs sufficiently alleged an agreement, as discussed below, Plaintiffs do not have a protected liberty or property interest in the District under 42 U.S.C. § 1983.

Neither the Amended Complaint nor the parties' initial briefing shed much light on Plaintiffs' constitutionally protected interest, prompting the Court to solicit supplemental briefs. (D.E. No. 77).  In their supplemental brief, Plaintiffs assert that the zoning and land use regulations for historic places granted them liberty interests in the aesthetic, architectural, cultural, environmental, and historical appeal of the District.  (D.E. No. 83, at 2).  Plaintiffs argue that "a State creates a protected liberty interest by placing substantive limitations on official discretion." (*Id.* (quoting *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983))).  And here, the regulations "place[] substantial limitations on official discretion" in preserving, for their benefit, the interests identified above.  (*Id.*).  In particular, they point out that the regulations protect those interests by imposing a discrete set of procedures and substantive standards that third-party applicants must satisfy to build in the District.  (*Id.* at 2–3).  Plaintiffs also assert they have a property interest "in the enforcement of the [regulations], because such enforcement is inextricably bound with their enjoyment and use of their land and residences."  (*Id.* at 4).

For several reasons, the regulations do not grant Plaintiffs a constitutionally protected liberty or property interest.  Before outlining why, it is important to begin by noting the well-settled rule that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."  *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).  "Nor does history support such an expansive reading of the constitutional text."  *Id.*

Thus, Plaintiffs are correct to seek out independent sources of state law to support a liberty or property interest.[3]   Indeed, state law may create constitutionally protected liberty and property

---

[3]     Indeed, absent an independent source of state law, the Bill of Rights confers fundamental liberty interests. *See Duncan v. La.*, 391 U.S. 145, 147–49 (1968).  There are also certain implied liberty interests not specifically enumerated in the Constitution, including, for example, those "central to individual dignity and autonomy."

interests that otherwise would not be protected. *See, e.g., Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (liberty); *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) (property). But when doing so, state law must confer those interests directly, not incidentally or indirectly, to the person claiming an entitlement to those interests. Two cases—*O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 (1980), and *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005)— illustrate this point.

In *O'Bannon*, 447 U.S. 773, the Supreme Court held that Medicaid patients, who were forced to transfer to a different facility because the government decertified their former facility, did not have a constitutionally protected liberty interest in avoiding transfer. *Id.* at 787–90. Although transferring patients inevitably followed decertification, the Court found significant "[t]he simple distinction between government action that directly affects a citizen's legal rights, or imposes a direct restraint on his liberty, and action that is directed against a third party and affects the citizen only indirectly or incidentally . . . ." *Id.* at 788.

> This case does not involve the withdrawal of direct benefits. Rather, it involves the Government's attempt to confer an indirect benefit on Medicaid patients by imposing and enforcing minimum standards of care on facilities . . . . When enforcement of those standards requires decertification of a facility, there may be an immediate, adverse impact on some residents. But surely that impact, which is an indirect and incidental result of the Government's enforcement action, does not amount to a deprivation of any interest in life, liberty, or property.

*Id.* at 787. "[T]he fact that the decertification of a home may lead to severe hardship for some of its elderly residents does not turn the decertification into a governmental decision to impose that harm." *Id.* at 788.

Similarly, in *Town of Castle Rock*, 545 U.S. 748, the Court held a person holding a

---

*Obergefell v. Hodges*, 576 U.S. 644, 663 (2015). None of these rights, as explained above, are implicated here. *See DeShaney*, 489 U.S. at 195.

restraining order against another did not have a constitutionally protected property interest in the police enforcing that order, in part, because "the alleged property interest here arises incidentally, not out of some new species of government benefit or service, but out of a function that government actors have always performed—to wit, arresting people who they have probable cause to believe have committed a criminal offense." *Id.* at 766–67. "In this case," the Court said, "as in *O'Bannon*, '[t]he simple distinction between government action that directly affects a citizen's legal rights . . . and action that is directed against a third party and affects the citizen only indirectly or incidentally, provides a sufficient answer to' respondent's reliance on cases that found government-provided services to be entitlements." *Id.* at 767–68 (quoting *O'Bannon*, 447 U.S. at 788).[4]

Here, the regulations do not directly grant Plaintiffs, or other concerned residents of the District, any substantive liberty or property interests. Rather, the ordinances impose substantive limitations on local officials' authority in granting or denying a building permit. By doing so, certain benefits flow to Plaintiffs and other nearby residents—but only indirectly and incidentally, just as in *O'Bannon* and *Town of Castle Rock*. The benefits Plaintiffs and others derive—in the

---

[4]      Various other cases support the direct/indirect distinction. *See Kerry v. Din*, 576 U.S. 86, 101 (2015) (plurality opinion) (consular officer denying citizen's spouse entry into the United States did not deprive citizen of liberty interest in living with her spouse because of, among other things, the distinction between direct and indirect impacts on liberty); *Sierra Nevada SW Enterprises, Ltd. v. Douglas Cty.*, 506 F. App'x 663, 665 (9th Cir. 2013) (approval of the land development for another development did not deprive developer of property interest by reducing the market value of transferable development rights because "[a]n indirect impact of that kind is not a 'deprivation' for purposes of procedural due process"); *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 178 (2d Cir. 1991) (county canceling contract with provider of home healthcare did not deprive liberty interest in choosing provider because "state action that incidentally burdens an indirect governmental benefit does not rise to the level of a deprivation of a liberty interest"); *Cospito v. Heckler*, 742 F.2d 72, 81 (3d Cir. 1984) ("It is elemental that not all deprivations of property implicate the due process clause, but only those deprivations which were the result of some governmental action. In this context, the Supreme Court in [*O'Bannon*] noted that deprivations which are only the indirect result of a government decision are not cognizable under the due process clause."); *Grove City Coll. v. Bell*, 687 F.2d 684, 704 (3d Cir. 1982) ("*O'Bannon* is dispositive of the due process issue raised here. We perceive no difference between the impact on the students when the Department terminated Grove as an eligible education program and the impact on the patients when HEW decertified the nursing home in *O'Bannon*. If the *O'Bannon* patients had no enforceable expectation of continued benefits to pay for care at Town Court when that nursing home was decertified, neither would Grove's students have an enforceable expectation of receiving grants to attend Grove, after Grove's participation in the BEOG program was ended."); *cf. Shanks v. Dressel*, 540 F.3d 1082, 1090 (9th Cir. 2008) ("The claim is an unusual one; more typically, the plaintiff asserts that it personally was denied a permit without due process of law, not that someone else was granted a permit without the decisionmaker following the procedure established by state law.").

historical, aesthetic appeal of the neighborhood, and in the enjoyment and use of their properties—are incidental to local officials enforcing the law against third parties.  Plaintiffs' interest in the law being enforced—while a weighty and important one—is not a protected liberty or property interest under the Due Process Clause.  *See Town of Castle Rock*, 545 U.S. at 766–68; *DeShaney*, 489 U.S. at 195.

To be sure, New Jersey law gave Plaintiffs, directly, the right to challenge the Commission's decision even though the Municipal Code extends procedural rights solely to applicants.[5]  N.J.S.A. § 40:55D-72(a) grants an interested party the right to appeal to the Board of Adjustment a decision of an administrator of a municipality that is "based on or made in the enforcement of the zoning ordinance or official map."  And Plaintiffs would appear to be an interested party because, they allege, Defendants' decision to build the transmission poles impacts Plaintiffs' "use and enjoy[ment of their] property."  *Harz*, 191 A.3d at 556.  Moreover, an interested party may file "a prerogative-writs action and Order to Show Cause in Superior Court aimed at enjoining the permit."  *Id.*; *see also* N.J.S.A. § 40:55D-18 (granting an "interested party" the right to "institute any appropriate action or proceedings to prevent" unlawful use of property).[6]  However, the right to process is not, on its own, a protected liberty or property interest.  *Town of*

---

[5]      In the Amended Complaint, Plaintiffs purport that, had PSE&G followed the proper process, they and other concerned residents of the District would have had the right, pursuant to the *Municipal Code*, to voice their concerns about the project to the Commission at a mandatory public hearing (Am. Compl. ¶¶ 70–74), to appeal the Commission's decision to the Board of Adjustment, and, if necessary, to challenge the decision in the New Jersey Superior Court (*id.* ¶¶ 82–83).  However, the Municipal Code does not grant them those rights.  Instead, those rights, under the Municipal Code, extend to *applicants*.  Municipal Code § 41:10-13-1 reads, "At the request of any person seeking to undertake actions requiring review as per the provisions of this Chapter, the Commission shall schedule a hearing on his or her application."  The Municipal Code does not contemplate a third-party's right to demand a hearing.  Similarly, Municipal Code § 41:10-21-3 says that "[a]n applicant dissatisfied with the action of the Commission relating to the issuance or denial of a permit shall have the right to appeal to the Board of Adjustment pursuant to [N.J.S.A § 40:55D-70a] within 20 days after receipt of notification of such action."  As discussed in the body of this Opinion, however, New Jersey law appears to have granted Plaintiffs certain procedural rights that they chose not to exercise.

[6]      Instead of pursuing these available avenues, Plaintiffs filed suit in federal court the day the construction of the transmission poles began, purporting that they were denied those avenues.

*Castle Rock*, 545 U.S. at 771 (Souter, J., concurring); *see also id.* at 764 (majority opinion) (explaining that "an entitlement to nothing but procedure" cannot "be the basis for a property interest"). Rather, process protects a substantive interest to which a person has a "legitimate claim of entitlement." *Olim*, 461 U.S. at 250. Plaintiffs' protected interest cannot be defined by the City of Newark's procedures because the right to procedural due process "is conferred, not by legislative grace, but by constitutional guarantee." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (citing *Arnett v. Kennedy*, 416 U.S. 134, 167 (1974)). An individual's property or liberty interest, therefore, is always "distinguishable from the procedural obligations imposed on state officials to protect it." *Town of Castle Rock*, 545 U.S. at 772 (Souter, J., concurring).

Finding a liberty or property interest here would have sweeping consequences. Local discretion is invariably subject to limits, and almost every local decision impacts local property—be it by increasing or diminishing property values, the aesthetic appeal of a neighborhood, or the enjoyment and use of land. Local government inaction will always displease at least one person. Finding a liberty or property interest here, simply because local officials do not have unfettered discretion, would effectively transform "any local political issue" into a federal constitutional issue. *Trotta v. Borough of Bogota*, No. 12-2654, 2016 WL 3265689, at *8 (D.N.J. June 6, 2016). As Judge McNulty has explained,

> Real property ownership is obviously a protected property interest, and the Borough may not deprive a person of such property without due process (and just compensation). The plaintiffs here, however, do not assert a taking claim; they are not being deprived of the use of their properties, or of the properties themselves. Rather, the plaintiffs assert a more elusive entitlement to have the market value of their properties remain undiminished by official action. Now a homeowner can plausibly tie virtually any local political issue to the value of his or her property. Almost any condition in a small New Jersey town—traffic, schools, transit schedules—affects property values. But each citizen is not constitutionally entitled to a hearing in advance of every change in traffic patterns, curricula, or bus

schedules. In short, lines must be drawn. Case law has not extended procedural due process protections to a person's derivative or indirect economic interest in the condition of neighboring (public) properties as they affect the value of that person's own property.

*Id.* (internal citations omitted).

Plaintiffs have not cited any authority supporting a due process claim challenging a city or town's failure to enforce local ordinances against a third party. The only case they cite is *Watrous v. Town of Preston*, 902 F. Supp. 2d 243 (D. Conn. 2012). But *Watrous* involved the government ordering the property-owning plaintiff not to make certain use of his property. *Id.* at 250–51. Said another way, the challenged government action *directly* impacted the plaintiff's property rights.

Nor could the Court find any law in support of Plaintiffs' sweeping view of due process. Instead, the Court's independent research uncovered various cases holding that neighboring property owners have no right to dictate the manner in which local officials enforce local zoning rules against a third party. *See Tollbrook, LLC v. City of Troy*, 774 F. App'x 929, 934 (6th Cir. 2019) (declining to adopt the "proposition that a constitutionally protected liberty interest arises from an expectation that municipalities will follow their own ordinances"); *Schmitz v. Denton County Cowboy Church*, 550 S.W.3d 342, 357 (Tex. App. Fort Worth 2018) ("Appellants have no protected property interest in the manner in which the Town enforced or failed to enforce its ordinances against the Church, rendering Appellants' claim under § 1983 not viable and subject to the Town's plea to the jurisdiction."); *Moore v. City of Parkville*, 156 S.W.3d 384, 391 (Mo. Ct. App. 2005) ("Appellants . . . cite no authority to demonstrate that they, as neighboring property owners to property subject to a rezoning request, have a constitutionally protected property interest in continuing the existing zoning classification of the nearby property. In fact, little cogent support exists for the proposition that a neighbor has a constitutional right to have restrictions imposed on others.").

Plaintiffs cannot show they have a constitutionally protected liberty or property interest in the enforcement of local zoning rules against a third party. Without a substantive interest, Plaintiffs are not due any process. Consequently, the Court dismisses their due process claim.

### D.   Takings

Plaintiffs also allege Newark Defendants effected an unconstitutional taking by constructing the transmission poles. They base this claim on the allegation that constructing the transmission poles deprived them of their "legal interests in the Forest Hill Historic District." (Am. Compl. ¶¶ 2, 30, 35 & 222). For Plaintiffs to succeed on their takings claim against Newark Defendants, they "must first show that a legally cognizable property interest is affected by the Government's [taking of property for public use]." *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 151 (3d Cir. 2018) (quoting *Prometheus Radio Project v. FCC*, 373 F.3d 372, 428 (3d Cir. 2004)). These property interests, like in the Fourteenth Amendment context, "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id.* (quoting *Roth*, 408 U.S. at 577).

As previously discussed, Plaintiffs do not adequately allege a constitutionally protected property or liberty interest in the District. See Section III.C, *supra*. This fact defeats Plaintiffs' takings claim. Moreover, even if Plaintiffs adequately alleged a constitutionally protected property interest, there would be no taking here. Generally, there are two types of takings. The first is a *per se* taking, which occurs when the government physically seizes property or directly appropriates it. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). When the government commits a *per se* taking, the rule is simple: "The government must pay for what it takes." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021). The second is a regulatory taking, which occurs "[w]hen the government, rather than appropriating private property for itself

or a third party, instead imposes regulations that restrict an owner's ability to use his own property." *Id.* To determine whether such a taking has occurred, a court must "balanc[e] factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Id.* (quoting *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)).

Plaintiffs do not adequately allege either type of taking. First, there is no *per se* taking because they do not claim the City of Newark physically seized *their* property or appropriated it for public use. *See Cedar Point Nursery*, 141 S. Ct. at 2072 (identifying the question as "whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property"). Indeed, the land on which the transmission poles were built is public land. Second, and similarly, there is no regulatory taking because Plaintiffs do not allege that the City of Newark prohibited certain uses of *their* property. *Id.* Moreover, while Plaintiffs claim that constructing the transmission poles on public land diminished the value of certain interests in their property and the District, the Supreme Court has been clear "that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993) (citing *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926) (approximately 75% diminution in value)); *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (92.5% diminution)); *accord Newark Cab Ass'n*, 901 F.3d at 151–52; *see also In re 106 N. Walnut, LLC*, 447 F. App'x 305, 309 (3d Cir. 2011) ("'[E]ven a substantial reduction of the attractiveness of the property to potential purchasers' generally 'does not entitle the owner to compensation under the Fifth Amendment.'" (quoting *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 15 (1984))).

To be sure, there is "no magic formula [that] enables a court to judge, in every case, whether a given government interference with property is a taking." *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012). But Plaintiffs have not attempted to argue that Newark Defendants effected some nontraditional taking, nor do they adequately allege a *per se* or regulatory taking. Consequently, the Court dismisses Plaintiffs' takings claim.

### E.     Fraud on the Court

Plaintiffs also assert a fraud-on-the-court claim, alleging that Newark Defendants and PSE&G conspired to file fraudulent documents with the Court in violation of Plaintiffs' due process rights under the Fifth and Fourteenth Amendments. (Am. Compl. at 50–51). These documents appear to include the allegedly "fraudulently doctored" street-sidewalk permit, which Plaintiffs purport to be a "building permit." (*Id.* ¶ 98). However, for at least two reasons, Plaintiffs do not plead such a claim.

*First*, the Court is not aware of any authority, and Plaintiffs have cited none, suggesting that a fraud-on-the-court claim is a cognizable constitutional claim under 42 U.S.C. § 1983. *Cf. Interstate Fire & Cas. Co. v. 1218 Wisconsin, Inc.*, 136 F.3d 830, 836 (D.C. Cir. 1998) ("Because such an action does not sound in tort, the only remedy available to an insurer is vacatur of the consent judgment."); *Fink v. United States*, No. 19-9374, 2019 WL 2353662, at *3 (D.N.J. June 3, 2019) (holding that fraud-on-the-court claim did not raise a substantial federal claim); *In re Reinhart*, No. 14-02204, 2015 WL 1206714, at *9 (Bankr. W.D. Pa. Mar. 12, 2015) ("[T]his Court has located no case in the Third Circuit which has held that 'fraud on the court' is an independent cause of action for monetary damages . . . .").

*Second*, a fraud-on-the-court claim, at most, is an equitable claim brought as a basis to *vacate an order or a judgment* because a party has intentionally deceived the court. *See Herring*

27

*v. United States*, 424 F.3d 384, 386 (3d Cir. 2005).  A claim for fraud on the court requires "(1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) in fact deceives the court." *Id.*  The fraud must be so egregious and supported by "clear, unequivocal, and convincing evidence."  *Id.* at 386–87.  Here, there has not been a final judgment, order, or proceeding rendered against Plaintiffs.  Moreover, the basis of the Court's decision today has nothing to do with the purportedly fraudulent nature of the street-sidewalk permit.  The Court therefore cannot be said to have been deceived.  Accordingly, Plaintiffs' claim for fraud on the court is dismissed.

## IV.   CONCLUSION[7]

For the above-stated reasons, the Court **GRANTS** Defendants' motions to dismiss.  Because Plaintiffs have previously amended their complaint, and because they offer no basis, much less request, leave to file a second amended complaint, the dismissal is ***with prejudice***.   An appropriate Order will be entered.

Dated: August 21, 2022

Hon. Esther Salas, U.S.D.J.

---

[7]    Having dismissed all federal claims raised in the Amended Complaint, the Court declines to exercise supplemental jurisdiction over claims arising under state law.  28 U.S.C. § 1367(c)(3); *Yue Yu v. McGrath*, 597 F. App'x 62, 68 (3d Cir. 2014) ("[P]endent jurisdiction is a doctrine of discretion, not a plaintiff's right."); *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) ("This Court has recognized that, 'where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis in original))).